No. 181109 United States v. Brad Smith Good morning. May it please the court. My name is Richard Guerriero, and I represent the defendant Brad Smith. I would like to focus my argument this morning on the Fourth Amendment question, and in particular the implied consent doctrine that allows the police to engage in the familiar knock-and-talk procedure. And with respect to implied consent, I want to talk about two specific concepts. The first is what constitutes revocation of implied consent. This is not an issue that's been well addressed by the U.S. Supreme Court or by this court. The U.S. Supreme Court has acknowledged that there is revocation of consent, of implied consent, and other courts have recognized it, but it has not, a clear rule has not been established. Counsel, can I step you back? At least on one reading of the case law, we don't even get into implied consent for people to come up and knock on the front door unless we are in the front porch or curtilage area. Do you agree with that?  Okay, so on the facts of this case, could you tell us why you think that when the questioning began, it was in a curtilage area, what your theory is, and be consistent about what you raised in the district court and what you're telling us. Yes, Your Honor, and I believe that I was pretty careful in the factual section of our brief to point out that we were relying on the testimony of the agents. Yes, thank you, but tell us now. First of all, it's undisputed that the agents entered the curtilage and knocked on the front door. But there's no encounter with your client until they've left the front door, they've walked off the front porch, and they've walked over to a shed that appears to be in an open area, or have I got this wrong? I would respectfully disagree with that description, Your Honor. The layout of the property is that there is a driveway that comes straight through that locked gate, that goes past the front of the house where there is a walkway. The agents climbed through the locked gate, came down the driveway, went up to the house, knocked on the door, no answer, came back down the pathway, and then continued down the driveway. Having heard a sound. Having heard a sound, not when they were at the front door, but when they got back to the driveway. They continued down the driveway to the front area right in front of the garage. It's not entirely clear when they went in the garage. They went in the garage at some point. I don't think it matters for my purposes because our position is that that front pathway, the driveway down to the front of the garage, all of those areas adjacent to the house, that is the curtilage of the home. Okay. All right. So, in fact, there's a garage and there's an open carport, right? And they're sort of next to each other. And where was your client when the agents first encountered him? Our client was in an area that was not visible from the road, not visible from the front porch, not even visible to the agents as they walked down the driveway. He was behind the carport. And you'll notice in the exhibits we submitted that there's lattice work on the front part of the carport. I'm going to get there. So the agent went to the back front corner of the carport, so the edge of the carport that is right on the driveway. He's outside the carport. He's outside of the carport, according to this testimony and the other. The agents differ in their testimony. One says that he stopped on the concrete pad and waved until he got our client's attention. The other, Agent Lopez himself says he proceeded shortly to the grass. Why is that area a curtilage area? In both Jardine's and Collins, the recent Collins versus Virginia case, they have described the areas immediately adjacent to the home. Oh, yes, but I didn't think this was immediately adjacent. I thought it was some distance from the house, certainly not within five to seven feet, and some distance actually from the driveway. We disagree with the government on that, Your Honor. What does the record show about how far it is? Well, unfortunately, the record is not as good as it should have been for our purposes. I was not trial counsel, and I also believe that the trial judge did not make a specific finding as to where the defendant was in terms of the distance from the agent. Well, he didn't, but that's part of my so what was argued to the district court. It seems that this point, which is essential to your argument, really was not the point of the argument before the district court. Well, I think the issues were preserved. I would certainly agree that I've changed the emphasis somewhat to put more of an emphasis on the law in Jardine's and Collins. But if I can answer your prior question, there is evidence in the record as to where the ditch was that the defendant was digging. And by all accounts, he was operating an excavator, a backhoe, some type of machinery, and the agents were not immediately able to get his attention.  You can see that ditch. And you can also see there is one document, I believe it's on page 3 of volume 2 of the appendix, where the defendant drew a diagram where he places the ditch. And in fact, that's consistent with the photographs submitted by the government. And when you look at that, you see that it is maybe 10 feet behind the garage, not much more. You can see the white line. I'm not sure I understand why this matters so much. If I get it, the government concedes that if you're standing at the door knocking, you're on the curtilage. Okay. Your position is, I think, the implied license to enter the curtilage was revoked by the gate at the front of the driveway. That's correct. Okay. In consequence of that, if you're right about that, then when the officers went and knocked on the door, they committed a Fourth Amendment violation because they entered the curtilage at that point. That's right. If that's true, then the only thing that's left in the case is whether the subsequent information they got is a fruit of that Fourth Amendment violation. And that requires you to make some attenuation analysis. That's correct. Okay. That's true whether the subsequent conversation between the two of them occurred in curtilage or not, because it is undisputed they entered some curtilage at some point. And if the license had been revoked, they had no business doing that. There's a Fourth Amendment violation. We have to do the attenuation analysis. I agree with that. Okay. But if we reject the notion that the curtilage starts at the outer most— No, no, no. The curtilage does not. That's not my—just so we're clear. The curtilage is one foot in front of the door. That's undisputed. The officers entered that curtilage. The only question is, for Fourth Amendment purposes, did they have a license to enter it? Your position is that the license that they ordinarily would have to enter it was revoked by virtue of the message conveyed at the front gate. Absolutely. At the front gate. And fencing, et cetera. Yes. If you're right about that, then there is a Fourth Amendment violation. And then the only issue is, was the subsequent information gleaned that you want to have suppressed to attenuate it from that Fourth Amendment violation to be a fruit? If the Court goes that far with me, I agree. Okay. So then, on that point, what I don't understand about your case is, what is in the record that indicates that the Fourth Amendment violation had any impact of a kind that could lead us to conclude that the subsequent interactions were not attenuated from the violation? And I say that because if there had been a license, they do their knock and announce. A person can say, I'm not talking to you. They violated that license, so they're there. It is possible in such a circumstance that the mere presence of a person in violation of the license would make one feel so pressured that they had no choice but to submit. You don't argue that. You don't say that the presence of the officers just by being there. I would respectfully disagree with that. What happens is when they arrive, he's fairly friendly to them. And you don't contest that. Well, I don't contest that he was polite and cooperative. However, we went to great lengths to point out that, first of all, Trooper Kibito, then Investigator Kibito, was in fact armed, and that two agents stayed with him throughout the entire time, beginning with the encounter. But all of that would be true even if they had a license. So in other words, what about the Fourth Amendment violation? The presence of them in defiance of the revocation of the license had any effect on the interactions? Well, he certainly would not have sought them out. But that can't alone be enough. So you rely on Cordero Osorio. In Cordero, what happened was they had unlawfully acquired evidence. They go to their wife and say, we have this evidence of a crime. That puts a great deal of pressure on the person. All that happened here is they just showed up. If I could, I don't want to run too short on my time, so I'll just list out some of the factors that I think are important. First of all, when he was operating the machinery, he had a friend there with him. The government agents deliberately separated that friend from him so that he wouldn't have any support or anyone else there for feedback. Number two, when the agents first spoke to him, they did two things. First, they were not telling the truth about why they were there, which later came out. And secondly, they immediately— But that's not the Fourth Amendment violation you're complaining about. The Fourth Amendment violation is appearing on the privilege absent the license. And I'm trying to figure out what about that violation had any impact other than just the presence of the person himself. So their dishonesty, and I use that, I don't mean to be disrespectful, but their ruse, as they said, encouraged him to talk to them. So you could bring that argument even if there had been a license. I'm sorry, I'm not following that. Even if there had been a license to enter the curtilage, you would still be able to make the argument you're now making about how they put pressure on him through the ruse. Sure, we would probably still be arguing voluntariness. So what I'm trying to figure out is if we reject that contention, the ruse alone is not what makes it involuntary. You have an argument potentially that there is a fruit of the Fourth Amendment violation, which is the defiance of the revocation of the license and the appearance of the curtilage. What about that can be said to be the cause of the submission of the defendant to the questioning, other than the mere presence? I think that understates the mere presence. Someone's digging a ditch in their backyard, doing their work, and then all of a sudden armed federal agents show up and start asking questions, and there is no passage of time. It's not like there's an intervening circumstance. It's not like there's three hours. I mean, if we look at the factors that are listed in the case law, none of those factors that would That's a but-for test, which we don't usually use for attenuation. No, I'm saying that it was very close. I'm sorry. There's an assumption being made here that the curtilage starts at the wire fence at the road. No, that's not your point. That's all part of your assumption, I think. No, my assumption is that the curtilage is at the one foot in front of the door. Well, okay. The warning is given outside. The warning is given outside. So if you agree that they could have come in, the main house was not the house that he lived in. There's no argument about the main house. He didn't live there. So they knocked on that door, and there was no answer there. Now, does that mean that they can't then, when they hear the noise in the back, say, Well, there's nobody in this house. We're going to go in the back and see what's back there. Why can't they do that? They didn't know which house he lived in, Your Honor, and the government did not make that argument below, and I don't believe has made it here. And probably most importantly, the express language in Jardines is that the license to enter is to knock on the front door. If there's no answer to the door, linger briefly and then leave, not go looking to see, Well, maybe there's two houses or maybe there's somebody in the back. This is different from the other cases where they wander around the house. They heard a noise. After they knocked on the door and there was no answer, they heard a noise. And they walked around, and that's when they saw the defendant. Well, I would agree with you that that's not a circumstance squarely addressed by the case law, but my suggestion would be that after Jardines phrased the license the way that it did, the most they could do is if they saw a person and he was close enough to be addressed, then I think they could address him. But because they hear the noise, not of voices or not of seeing any person, but simply hearing the sound of a machine, that that licensed them to proceed to go further through the curtilage to look to see what the sound is, that's not what any reasonable salesperson or Girl Scout as in Jardines would think that they would be entitled to do. If you heard a lawnmower running in the back, you wouldn't go around and say, Hey, you don't think the Girl Scouts wouldn't sell as much if they did. I have another question. The district court did not analyze it in the way that Judge Barron has posed the hypothetical to you, but it did analyze the question of consent. Yes. And in the consent finding of fact, after hearing testimony and finding in part your client not credible, found that there was no coercion. He was not under any pressure whatsoever that removed the voluntariness from his consent. It does seem to me there is some overlap between the attenuation doctrine, even if one were to accept the illegality of the presence on the porch, and the district court's findings of consent. So why doesn't your case end there, even with assuming that hypothetical? Well, I don't want to repeat the answers I've given previously, but the agents are... Yes, but the district court expressly rejected in its consent finding an argument that his will had been overborne by pressure, by deception, by anything of that sort. I think I understand now, and maybe I can address it this way. I mean, in order to effectuate the remedy for the Fourth Amendment violation, we're looking at the factors eliminated in Brown v. Illinois. It's not simply a question of the defendant's consent. It's, for example, the purpose and the flagrancy of the misconduct, which are expressly acknowledged factors. They don't have to do with the consent. It's because the Fourth Amendment violation should be remedied by suppression. But then there's the intervening circumstances, one of the factors in Brown. The intervening circumstance would be the consent. And as I understand it, the only reason you say that factor doesn't go against you is because if they weren't there, he couldn't have consented. Well, but I just thought that's a but-for test, and I just don't know if that's what we're supposed to apply as to that factor. Okay. I realize my time is up. I'll just emphasize what I said before. They were lying to him. They separated him from his friend. They're armed federal agents. I think that plus the conduct of violating the Fourth Amendment is sufficient. Thank you. Thank you. Good morning. Seth A. Fan for the United States. I think, Judge Barron, the reason they don't pursue it the way you've articulated today is the defendant didn't know that they knocked on the door. He's out in a backfield of a pecan farm working on a piece of machinery. He doesn't know. So their argument is, no, the Fourth Amendment violation is they confronted him on the curtilage, which is the back pecan field, the corner of the driveway that leads to the back pecan field, and they couldn't confront him there because the implied license had been revoked by the gate. But they do argue that they knocked on the door, which is the curtilage. I mean, I concede he knocked on the door. So is that a Fourth Amendment violation when they did that? Well, I say no. And that's because why? Because that gate at the front is not an unambiguous revocation of the implied right to enter for the purposes of attempting to talk to someone. And how come? Because it just is an open gate. Open gate? Open in the sense that a person, it isn't closed, but a person could walk through it. You saw the pictures in the defendant's brief that have large gaps. Do you mean if that gate had a padlock on it, you would have the same conclusion? I think yes. I think because the purpose of that gate is not to keep a walk, someone on foot out. That's not the kind of gate you'd put up if you were trying to keep people on foot out. You're trying to keep vehicles out. And it says for deliveries, call this number. So if I am not in the car and I have a delivery and I walk up, I should read that sign to say come on in? If you have a delivery. I'm a delivery. I'm a pizza delivery. I don't have my car. I'm walking. I got my pizza. I'm making a delivery. There's a sign saying call here for deliveries. Your view is that the message conveyed is go in? I don't think it's entirely clear that it's any person wanting to come up to the door to just have an exchange with the person, to say hello, to make a solicitation, is told unequivocally by that gate that it's definitely wrong to walk up to that house that is a large rural agricultural situation with no no trespassing sign, no keep off sign. I don't think it's that clear. No, I don't. If you couldn't squeeze yourself through the gate, many gates you can. If you couldn't squeeze yourself through the gate, the only way you could do was to somehow get between the wires or the fence. What do you think? Yeah, so this gate, I don't even think the word squeeze is required. There's a difference of opinion on that in the record. But I think that the Quintana case that they cite says yes, if you make fencing that is and you've got to scale the fence and engage in heroic conduct to get over the gate, yes, I agree with you. I thought that's not it. Go ahead. I think that may be this because in order to get in, you either had to somehow separate the gate enough to squeeze through, which is what the testimony seems to be, or you had to climb through the fence. I don't think it's very different to say climb through or climb over. But you could also have taken three feet to the left and went onto a pecan field and walked down the field to the same location. Because the fence didn't go all the way around? There was a gate and there was some perimeter fencing, but Dunn and Oliver... How did you get to the field? Did you have to go through the fence? The gate's at the top of the driveway and there is some perimeter fencing along the road. But if you read Dunn and Oliver... How factually would you answer the question? Yes, you have to go... Through the fence? I believe, over, around the fence, yes. What do you mean, around the fence? Over a fence. Over? Yes, a perimeter fence. Around... Over the fence. Let me not be unclear. Over the fence. It's the entire property surrounded by this perimeter fence. Along the road, yes. Yes, along the road. Because there are backfields, they have to go the other way as well. The peacons aren't going anywhere. So presumably the fence is to keep people out, not to keep the peacons in. I can't answer that. I mean... You could. But I honestly think we're not on the right topic here. Because unless we're saying... Unless we don't agree... None and all of us seem pretty clear to me that these kinds of fences on agricultural property don't create curtilage. So if we're talking about... No, no, no. That's the point. I want to make clear we're understanding the point. The contention is not this fencing is sufficient to make the driveway and the field curtilage. Okay, yes. The contention is that the fencing is sufficient to revoke the implied license to enter that which you don't dispute is curtilage, which is the front step right in front of the door. Okay, and if I accept that argument... And we just explained why I don't. But if I accept that argument, that has absolutely nothing to do with what happened in this exchange. There's absolutely no evidence that Brad Smith knew for a second that anyone had knocked on the door before they're standing on the concrete pad, waving their arms, saying, can you come over and talk to us? I don't understand why you are emphasizing what he knew. Unless this goes to the consent question. It's an objectively reasonable test. You're saying it's relevant to attenuation, and that's why you're raising it. Well, I think that's what Judge Barron is getting to, because Judge Barron is saying, look, government, there's a Fourth Amendment violation. I'm telling you, assume there's a Fourth Amendment violation. Now he's asking me, does it matter? And I'm saying it doesn't matter, because a defendant in this circumstance did not know that that had happened. So if we're trying to figure out how did this, this violation that I'm assuming... So then it would matter. I see. At that point, I understand that argument for attenuation. That would then make Judge Lynch's questions about whether the questioning occurred on cartilage relevant. Because if he was being questioned from a person who was on cartilage, then of course he would know that there had been a violation of legislation. And I understand why you say it's not clear that it is cartilage from where he's being asked. But now make one further assumption for my benefit. Assume that the questioning is occurring from cartilage, and I understand why the record may not support that conclusion. But even then, wouldn't the government still have a fairly strong attenuation? And that's the one I made in the brief, because I was arguing my case on the premise that the key argument here was that back piece of driveway was cartilage. That was their argument. And if I accepted that that's correct, and that it was wrong to be on that piece of cartilage, the back driveway, it still doesn't matter, because he honestly invited them into the house. Only at that point did they discuss child pornography. And just on that one point, just help me with this. I understand how this case is different than Cordeiro Rosario, because there the violation was the unlawful acquisition of the evidence, and it's pretty easy to see how presenting a person with evidence of a crime puts pressure on them to consent. Okay. I understand the defendant's counsel's contention to be okay, but the presence of the officers clearly is necessary to the consent. And then he's saying that that should be potentially enough. Right. I'm skeptical that's right, but I'm having trouble figuring out what authority I rely on to explain why the fact of the violation that leads them to be there, and then the consent occurs right after that, it's not like they leave and come back, isn't enough to say that there's no attenuation. I did cite a series of cases in that section of the brief that talks about that point, when it's a fourth amendment violation and then consent. And so there is a time lag, but what's critical, there is some time lag. Fifteen minutes, it's not that long, but there is the key facts, and I cited an 11th Circuit case that said time is not the most important thing, and it talked about what was. And that's what happened when the defendant actually gave the consent. And what happens here is he asks all about consent. What's going to happen if I don't consent? What are you going to do? Then he agrees to consent. They have a pleasant conversation, some of it's recorded. And in the end, he signs a consent form. And so what the case says is what makes attenuation, what makes attenuation is that he had full, fair opportunity to understand consent, why to give it, why not. So is the initial contact but for causation? Yes, but what I take the case to say is it is not causation. That's an attenuation case, not a consent case. These are attenuation cases talking about that standard and citing the factors that are here, including signing a consent form, understanding consent, and the nature of the exchange between the officers and the defendant when giving the consent. Do you want to take a break? I'll take a break now. So in my view of the case, I view it as the judge, I'll call it Judge Barron's recommended violation had no effect. The curtilage issue, in my view, the back patio, the back driveway is not curtilage. I rely on Dun & Oliver that says gates and fences do not convert areas that are otherwise not curtilage into curtilage because if that gate at the front of that driveway turns, that would turn this entire agricultural property into curtilage, and that is contrary to both Dun & Oliver. And so it was legal to confront him there, but even if it wasn't, when he brought them back and they had the exchange in the house, that was sufficiently attenuated that there's no Fourth Amendment violation. That's the government's position.  Thank you. Okay, thank you. Just briefly, Your Honor. First of all, I want to address a point made by the government in their argument that there was no discussion of child pornography and no apparent investigation relating to this offense while they were questioning the defendant in the curtilage. That's not correct. The record clearly shows that one of the first things they did was to try to elicit from him an email address, and when he didn't give the email address that they wanted that was linked to the child pornography that had been found in Michigan, they asked him did he have a second or backup address. So they're conducting the investigation and gathering information, and gathering information while in the curtilage is a search by all accounts. They're conducting the investigation and gathering that information right at that point in the curtilage when they're questioning him. On a separate point to address Judge Stahl's comments about the gate, number one, the only fact that I really argue with as far as the fencing and the gate and everything with the trial court about is this issue of exactly how it's constructed. The lead agent in the case testified that he could not have fit through any gap when they pulled the gates apart. Neither agent noticed that it could be pulled apart until after they went through it. Nobody testified that it was designed such that a pedestrian could pass through it, and Trooper Kibito only testified that she could pull it apart enough for her to squeeze through. She said she discovered that afterwards, And I mention that because without addressing it, there is a photograph of the exhibits that might be a little bit misleading. And then lastly, I would refer, Your Honor, to the Quintano and Hamilton cases that are cited in our brief. They're district court cases. In both of those cases, the later statements were ruled inadmissible in spite of, I think, arguments by the government similar to yours. Thank you. Thank you. Thank you both. All rise.